J. HENRY SCHLAG v. A. Y. JONES.

THOMAS WEITHAUSE v. A. Y. JONES.

CHARLES R. WEITERSHAUSEN v. A. Y. JONES.

TOWNSHIP OF SHALER v. A. Y. JONES.

APPEALS BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY.

Argued October 30, 1889—Decided January 6, 1890.
[To be reported.]

(a) A former owner of a lot upon one side of a street, through which, after crossing the street, a natural water-course ran, built houses upon and completely obstructed the bed of the stream over his own property, raised the grade of the street in front of it so as to prevent the stream from crossing, and diverted the water to another course on the other side of the street.

(b) The water, as thus diverted, ran by certain properties on the opposite side of the street, which were some distance away and had not been drained by the original water-course, at times injuring them and also overflowing certain township highways. Fifteen years after the diversion, the owners of those properties and the township brought actions for obstructing the water-course against the defendant, a subsequent owner of the lot·first mentioned.

1. In such case, the plaintiffs, having no interest in the water-course, had no right to invoke the rules of law intended for the protection of those who have an easement, as riparian owners, in the flow of the water over the lands of others.

2. A notice by the plaintiffs to the defendant, that his predecessor in title had obstructed the flow of the water along a natural bed, did not affect him, because it did not come from one having any ownership in or along the water-course which was the subject of it.

3. The damages, direct or consequential, flowing from the act of the former owner, to those not interested in the water-course, are like damages resulting from any other trespass, are properly chargeable to him by whom the trespass was committed, and the defendant was not liable. the absence of proof to the contrary, it was to be presumed that the

change in the grade of the street in front of defendant's property was made under the direction of the public authorities, especially after fifteen years of acquiescence and use of the highway as graded.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

Nos. 95–98 October Term 1889, Sup. Ct.; court below, Nos. 392 to 395 April Term 1888, C. P. No 2.

On March 14, 1888, J. Henry Schlag, Thomas Weithause, Charles R. Weitershausen and the township of Shaler severally brought actions of trespass against Alban Y. Jones and Charles E. Jones to recover damages for the alleged obstruction by the defendants of a certain natural water-course. The defendants pleaded in each case not guilty.

The four cases were tried together on March 26, 1889, and at the conclusion of the testimony the plaintiff in each case took a nonsuit as to Charles E. Jones.

The facts shown by the testimony were in substance as follows:

In 1870, Charles F. Klopfer and others purchased from William Sample a tract of land in Shaler township, Allegheny county, adjoining the borough of Millvale. Through this tract ran a toll road known as the Evergreen Hamlet plankroad. To the west of that road lay a stream of considerable size, called Girty's run. Crossing the plankroad and emptying into Girty's run, was a small stream which drained a considerable extent of land, roughly estimated at from 100 to 150 acres in extent. Many years before, a dam had been built across Girty's run, some distance above the land purchased, and a race, connecting it with a saw mill and a grist mill, constructed. For the greater part of its length the race lay along the eastern edge of the plankroad. It was constructed at a lower level than the small stream mentioned, and, at the point where it intersected the latter, the water of the stream was carried over it by means of a bridge or aqueduct.

In 1871 Klopfer and others laid off the land purchased by them from Sample into lots, streets and alleys. They had a plot of it made and put on record. The only water-course shown by the plot was Girty's run, and the Evergreen Hamlet plankroad was adopted as one of the principal streets.

### Statement of Facts.

On July 1, 1872, seven of the lots in said plan fronting on the west side of the Evergreen road and numbered from 262 to 268 respectively, were purchased by Martin Pfiester.   These lots were so laid out that the small stream which crossed the road ran from it into lot No. 263, thence diagonally across the front part of lot 264 and thence westward upon lot 265, in the direction of Girty's run.   In 1873 Pfiester built along his front on the Evergreen road, and about ten feet back from it, a solid row of seven brick houses, occupying thus his entire frontage. He also made a fill in front of his property and extending to the middle of the Evergreen road, and graded the rear of his lots, so that all surface signs of the water-course which had run through the lots were obliterated.   At the same time, the bridge or aqueduct on the opposite side of the road, which had carried the water of the small stream across the mill race, was torn away, letting the water run into the race.   For some years prior to this, the race had been abandoned, unused, and was dry, the dam on Girty's run having been cut.

On the opposite side of the road from the Pfiester houses were some lots bought by one Seibert.   He also filled up his side of the road, built over the water-course, and turned the water into Gray's alley, by which it thereafter ran into the mill race.

Charles R. Weitershausen, Thomas Weithause and J. Henry Schlag all purchased from Klopfer lots fronting on the east side of the Evergreen road.   Weitershausen bought his in 1871 and built on it in 1875 or 1876.   Schlag bought in 1871 and built in 1878.   Weithause bought and built in 1882.   The buildings erected on these lots were all located along or near to the line of the old mill race.   They were situated further down the street than the Pfiester houses, and were not upon ground that had been drained by the water-course which Pfiester and Seibert had stopped up.   The only way in which they were affected thereby was, that in consequence of the turning of the water into the old mill-race, in connection with a gradual filling up of the race that had taken place, and the raising of the grade of the Evergreen road, the water in times of heavy rains percolated into the cellars.   At such times water from the race also ran over and injured certain public roads occasioning expense to the township in connection with their repair.

In 1874, Martin Pfiester borrowed $13,000 from Charles R.

Fendrick, securing the loan by a mortgage upon his seven lots. About the same date Fendrick transferred the mortgage to Isaac Jones, father of the defendant A. Y. Jones. Under this mortgage a part of the property was sold by the sheriff in 1876 to Isaac Jones, other portions of it having been previously released from the lien of the mortgage. Isaac Jones died in 1878, and in 1882, in a partition of his estate, A. Y. Jones became invested with the entire title to two of the houses built by Pfiester, located on lot 264 and parts of lots 263 and 265. He testified that he had no knowledge of the former existence of the water-course upon the ground occupied by his houses until in 1887, shortly before the bringing of these suits, when he was notified by Mr. H. I. Riley, as attorney for the plaintiffs, to open it up.

At the conclusion of the testimony, the court, EWING, P. J., charged the jury in part as follows:

The court is requested by the defendant to charge the jury [inter alia]:

1. That under all the evidence the plaintiffs cannot recover. Answer: This point is refused.[1]

4. If the jury find, from the evidence, that the defendant acquired title to the property as improved by Pfiester, without any knowledge of the water-course or any signs of it on the ground, by which he should have known of its existence, and that he has only maintained the property as he received it, so far as the water-course is concerned, then the defendant took his title free from any burthen of such water-course and easement, and cannot be held liable in this action.

Answer: The fourth point is refused. While from the uncontradicted testimony we are of the opinion that there were and are marks on the ground, above and below his lots, from which the defendant, had he examined, could and should have known that an ancient water-course had been obstructed by the buildings he purchased, yet we are of the opinion that even if the traces of this water-course had been obliterated beyond his lots, he took the property subject to the natural right or servitude of the flow of water over it in the natural channel.[2]

5. That the plaintiffs, W. H. Weitershausen, Thomas Weithause and C. R. Weitershausen, and J. J. H. Schlag and Pfies-

ter, all purchased from Klopfer town lots, laid out in his plan of a town, in evidence, and were all thereby affected with the knowledge that no water-course, as here alleged, appeared upon the plan or affected the location of the lots, but that, on the contrary, said water-course was appropriated by the town lots in the plan, which were thereby offered for sale and purchased for the ordinary uses and improvements such as Pfiester made of his lots, and no one purchasing in the said plan can complain and maintain suit for such use of Pfiester's property as here alleged.

Answer: The fifth point is refused. If this water-course was the natural channel for several springs, rising on and outside the Sample farm plán of lots, and above and beyond the Sample farm, and had been the natural, ancient and necessary outlet for the springs and drainage of a valley a mile, or a mile and a half in length, and draining land to the extent of 150 acres or more, and that it had a well defined channel with constant flow of water therein, such that to carry it safely in high water, reasonably to be expected from time to time, would require a pipe of three feet in diameter, as testified to by plaintiff's witnesses, the stream was such a one as defendant and his grantors had no right to dam up and throw it on to the other lots in the plan, where it did not naturally run, although the plan of lots did not show the stream or mark its channel.[4]

6. In no aspect of the case do the several plaintiffs, any one or all, show that their land was drained or directly affected by the said water-course, so as to give them an easement therein, and thereby a right to its maintenance ; but, on the contrary, show that they are only affected by drainage of water, backed up and running in front of their properties, through or in place of an old millrace, artificially built and maintained on or in front of their properties, and that they built with full knowledge and, in the existing condition of things, without complaint; wherefore they cannot recover in this action.

Answer: The sixth point is refused, except as answered in the general charge. The plaintiffs do not complain of obstructions to the drainage of water from these lots, but of water wrongfully thrown on their lots from obstruction in the channel of a stream of water, which otherwise would not affect them.[5]

7. The township and other plaintiffs are each and all estopped from maintaining any claims for damages here, by their silence and acquiescence under which the defendant has acquired title, and remained ignorant of their alleged causes of complaint, until about the time of the bringing of these suits.

Answer: This point is refused.[6]

10. The evidence clearly proves that there has been no apparent water-course, or any evidence of any, upon the land of A. Y. Jones since 1873 or 1874, and that he acquired title in 1882, and never knew of this claim or of the fact of such water-course, until shortly before these suits, when he only learned of these claims thereof, of the evidence of which he only learned upon this trial, and in such case he is not liable in these actions.

Answer: Refused.[3]

12. That the alleged notice given A. Y. Jones by Mr. Riley was, under the circumstances as shown by the evidence in this case, not such notice as imposed any duty upon said Jones, so as to render him liable in these cases.

Answer: Refused. Taking the testimony of Mr. Riley and Mr. Jones, both or either, the notice was sufficient.[8]

This suit was originally brought against C. E. Jones and A. Y. Jones. It seems that Mr. C. E. Jones got lot No. 267 and a part of No. 266. Mr. A. Y. Jones got lot 264, with 8 feet of 263 and 7 feet 10 inches of 265, making 39 feet 10 inches fronting on the plankroad, and on that were two brick houses. According to the testimony, this water-course never ran over those lots of C. E. Jones; therefore Mr. C. E. Jones is not in any way responsible for the maintenance of this alleged obstruction and he is eliminated from the case. After the testimony was all in, the plaintiffs conceded that they had no case against C. E. Jones and took a nonsuit as to him.

You are, therefore, to consider now the case of A. Y. Jones alone, who owns this 39 feet 10 inches, and it is alleged that his houses are over the ancient bed of this stream that came down from the general direction of Gray's alley. There is uncontradicted proof that Mr. Pfiester did build over the bed of this run, and proof that he raised the ground so in front of his houses that this run could not pass down where it had before. There is no direct evidence of who tore away this bridge across the race, which was then dry or had been dry before. One of

Charge of Court below.

the witnesses says that when they began to dig the cellars for the Pfiester houses, the bridge was torn away by somebody, and that let the water down into the race. The plaintiffs claim that this building over the water-course had turned the water away from where it usually ran, along the side of the old mill-race, and damaged their property.

Now, if this were open country property, and the question were between the owners of the land above and Mr. Pfiester, who built these houses, there would be no difficulty about it. The general rule is this : An ancient water-course or spring cannot be dammed up and kept from flowing in its ordinary channel; the owner of the lower land must submit to the flow of water that nature would throw upon it ordinarily, whether it be surface water or a spring. Especially can he not stop a water-course of any size. In the city that rule is modified from the necessity of the case. When a piece of property is laid out in small building lots in a city or town, the general rule is that each owner must grade his own property so as to keep the water away from the lower property, and the owner of lower property may keep the water from flowing upon it. That refers to ordinary flowage, or to some small spring that has no definite channel over the lower property. We find no case that precisely covers the case before us. However, I do not understand the modification of the general rule to apply to a stream of any considerable size, with a well-defined channel and with water in any considerable quantity flowing in it constantly, and that will flow in it at ordinary seasons of the year. It clearly would not apply to Girty's run, because that is too large a stream.

There is some difference in the testimony in regard to the character of this stream. The witnesses, without exception, I believe, say that they never knew this stream to be dry, and that it had a well-defined channel. They differ in regard to the amount of water in the dry part of the summer. One, or perhaps two witnesses, said that at the very lowest they had ever seen it, it would be as much as an ordinary hydrant would discharge at full flow. Others say it would take two or three hydrants to discharge as much as it did at a low stage. A witness who says he examined the flow on last Saturday, and you will bear in mind that it has been rather a dry season, says that it would require a six-inch pipe to carry the water in it. The

witnesses vary a little in regard to the amount that would be carried in the spring and in the fall, or in what they would call wet seasons.

To constitute a stream of water such as we are of the opinion the owner of a lot or lots in a town plan cannot close up, without the consent of others, it is not necessary that there should be a flow of water at all times, in the very driest seasons. " A water-course," says a learned authority, " consists of bed, banks and water. The water need not flow continually, and there are many water-courses which are sometimes dry. There is a distinction to be taken in the law between a regularly flowing stream of water, which at certain seasons is dried up, and those occasional bursts of water which in times of freshet or melting ice or snow descend from the hills and inundate the country. To maintain a right to a water-course or brook, it must be made to appear that the water usually flows in a certain direction and by a regular channel, with banks or sides. It need not be shown to flow continually, and it may at times be dry, but it must have a well-defined and substantial existence."

The witnesses differ in describing the extent of the valley. The lowest estimate, I think, is half a mile; another a mile, and Mr. Cooper, who is accustomed to measurements and ought to be accustomed to make estimates, as he is an experienced engineer, estimates it at a mile and a half in length; that the water rises a mile and a half above and drains a valley, he says, with pretty steep hillsides, and would have an extent of 150 acres. He says the channel that went to this plan of lots, was a well-defined one. Below the Evergreen hamlet road, he says it was in places eight and possibly ten feet wide; other places, narrower. Some of the witnesses speak of it as from four to six feet wide. Some of them put it as deep as four feet; others say it was shallow in places.

Now, if this was a stream having a well-defined channel with banks going down to Girty's run, and being the outlet for springs arising above and beyond this plan of lots, and draining an extent of country three quarters of a mile, a mile, or a mile and a half long, containing 150 acres, then we say to you that it was such a stream as Mr. Pfiester could not dam up and stop and throw out of the channel where it was accustomed to

Charge of Court below.

run, upon other property holders. Ordinary surface drainage he could throw in a little different channel or in little different quantities from what it had been. When a plan of lots is laid out and streets made, it is not necessary that every inequality of surface shall be preserved in order to let the water run just where it had been running. The streets are the natural and ordinary place for small seepage or flow of a spring to run, and not across lots; but we think that if this stream be of the size and character described by the plaintiffs' witnesses, as we have recited to you, then it has passed beyond the kind of a stream that either lot-owners are bound to allow to be thrown upon their property, or the public upon the streets. The owners of the lots upon which it runs are bound to take care of it.

It is admitted that this row of seven brick houses built by Mr. Pfiester were somewhere over the ancient bed of this stream, though the witnesses differ considerably as to where it is; in fact, testimony could be taken that would throw the entire row outside of this stream, and it is only the property that is over the ancient bed of the stream that is responsible. If you find affirmatively the stream to have been of the character described by plaintiffs' witnesses, and that the houses that Mr. Jones has owned and controlled since 1882 were over the ancient bed of the stream, and you will have to find those facts affirmatively or else you would find for the defendant, then you come to other questions.

Mr. A. Y. Jones got the property in 1882. He says that he did not know that there was any stream passed over it; and there is no reason to doubt his word in regard to that; he does not seem to have given very much attention to it personally. If the testimony is believed as to the plain condition of the stream both above and below his lot, that there was an evident channel, we think a man of ordinary judgment and knowledge, if he had been looking, would have seen that there was a stream there; whether under his house or not, is a question for the jury, not the court. To find for the plaintiffs in this case you must find that one of Mr. A. Y. Jones's houses is over the ancient bed of this stream and blocks it up. We have already said in answer to a point of defendant's counsel that we do not think it necessary in this case that he should have seen or known it. [Even if all the marks had been ob-

literated from the plankroad down to Girty's run, we think, if the character of the stream was such as the witnesses describe, that until a longer time has elapsed and more acts been done than have been shown to have been done by others, the plaintiffs are not estopped from claiming that the stream should keep its original bed and not be thrown upon them.] [7] Under all the circumstances of this case we are of the opinion that he was not responsible for this until he had notice that his property was improperly obstructing this ancient bed.

We have further said, in answer to one of defendant's points, that if you believe either Mr. Riley's testimony in regard to that, or Mr. Jones', and they do not greatly disagree, and especially if you take them both together, Mr. Jones had sufficient notice before the bringing of this suit to at least do something towards remedying it; he does not appear to have done anything, but stands on his rights and says he is not bound to do anything.

Now, taking this view of it, the damages to the plaintiffs are necessarily very small compared to what some of them seemed to think they would be. We did not know, during the progress of the case, where the testimony was going to lead us, or we would have excluded a good deal of it. All the improvements that were made on any of this property were made before Mr. Jones had notice. Some of them were made before he owned it, and of course he is not responsible for that. Even Mr. Weitershausen's drain or sewer in front was made long before Mr. Jones had any notice of this; and while it is possible that Mr. Weithause may have suffered five dollars a month decrease in the rental value of his property from this water being in front of it, I think the much more obvious reason for the decrease in rents is the fact given in evidence this morning that the mill of Graff, Bennett & Co. was idle, the workmen having nothing to do, or going away. But, giving a reasonable time for Mr. Jones to do something after he had notice, if there was any actual decrease in rents from that cause, they would be entitled to recover that.

If you find that this water was improperly thrown upon plaintiffs' property, or either of them, they would be entitled to nominal damages, some trifling sum, even if there was no proof of any considerable pecuniary damage. The question

here is very much more important as to the right than it is to
the amount of damages.

The jury rendered a verdict in favor of the township of Sha-
ler for 6¼ cents, and a verdict for $20 in favor of each of the
other plaintiffs. Judgments having been entered upon the
verdicts, the defendant took these appeals, assigning for error:

.1–6. The answers to defendant's points.[1 to 6]

7. The part of the charge embraced in [ ] [7]

8. The answer to defendant's twelfth point.[8]

*Mr. M. A. Woodward*, for the appellant:

1. We maintain here, that when A. Y. Jones purchased his
houses and lots, in 1882, without anything upon or about the
place, to indicate that there had ever been a water-course over
it, he purchased under the same protection against that burden,
which had been obliterated nine years before, as he did against
any other secret interests, claims, rights or titles of which he
had no knowledge or warning, and of which there was nothing
upon record, nor any one in possession, to give him notice,
and of which he never heard until 1887.

2. These plaintiffs, after standing by silent, without taking
any action to uphold their claims, for fourteen years, are now
estopped and should not be heard: Ballard v. Butler, 30 Me.
94; 3 Kent. Com., 448; Angell on Water-courses, § 247;
Durell v. Boisblanc, 1 La. Ann. 407; Arnold v. Cornman, 50
Pa. 361; Washburn on Easements, 707; Rhodes v. White-
head, 27 Tex. 304 (84 Am. Dec. 631); Stokoe v. Lingers, 8 El.
& B. 31. But our first position is impregnable. We know
of no peculiarity in an easement, to protect it as against an in-
nocent purchaser, above other interests in lands.

*Mr. James Fitzsimmons* (with him *Mr. H. I. Riley*), for the
appellees:

1. The assignments of error raise practically but one ques-
tion: Can a party acquire the right to divert a natural water-
course in any period less than twenty years? The authorities
cited for the appellant relate entirely to incoporeal heredita-
ments. But there is a distinction between an incoporeal
hereditament and a real hereditament such as a natural water-

course: Shury v. Piggott, 3 Bulst. 339; Woolrych on Water-courses, 1 Am. Ed., § 146; Stanton v. Woolrych, 26 L. J. Eq. 300; Kauffman v. Griesemer, 26 Pa. 407; Martin v. Riddle, 26 Pa. 415. In the case of the latter, twenty years adverse use is requisite: Angell on Water-Courses, § 133; Wright v. Howard, 1 Sim. & S. 190; Bealey v. Shaw, 6 East. 208; Ashby v. White, 2 Ld. Raym. 938; Snow v. Parsons, 28 Vt. 463 (67 Am. Dec. 723); Strickler v. Todd, 10 S. & R. 63; Hoy v. Sterrett, 2 W. 327; Vaur v. Hill, 1 Bing., N. C., 549; 3 Tomlin's L. D. 784; Shields v. Arndt, 3 Green Ch. 234; Alexander v. Kerr, 2 R. 83; Beidelman v. Foulk, 5 W. 308.

2. The defendant therefore had not a shadow to stand on. Schlag and Weitershausen purchased in 1871. At that time this stream of water flowed in its well-defined, ancient channel. Pfiester bought in 1872 and in 1873, and without regard to the rights of any one he diverted the water into the old mill-race. A few months after that the mortgage was taken by Isaac Jones. Notice to him would be notice to A. Y. Jones, and he was bound to examine the ground above and below the property and is chargeable with notice of the existence of the water-course: Pyer v. Carter, 1 H. & M. 915; Beidelman v. Foulk, 5 W. 308; Hervey v. Smith, 1 K. & J. 394; O'Brien's App., 11 W. N. 229. The defendant stands in no higher equity than Pfiester: Alexander v. Kerr, 2 R. 83; Overdeer v. Updegraff, 69 Pa. 110. The plaintiffs have the option to sue either of them: Alexander v. Kerr, supra; Beidelman v. Foulk, supra; Staple v. Spring, 10 Mass. 72; Pillsbury v. Moore, 44 Me. 154 (69 Am. Dec. 91); Eastman v. Amoskeag Mfg. Co., 44 N. H. 143 (82 Am. Dec. 201); Noyes v. Stillman, 24 Conn. 15; Kansas Pac. Ry. v. Mihlman, 17 Kan. 224; 1 Chitty on Pleading, 84; 2 Selwyn's Nisi Prius, § 1130.

OPINION, MR. JUSTICE WILLIAMS:

These cases were heard together. They present a novel state of facts, and raise an interesting legal question. It appears that in 1871 one Klopfer owned a tract of farm land in Shaler township, which he laid out in town lots and offered for sale. In 1872 he sold six lots, having together a front of 144 feet along the lower side of Evergreen street, to Pfiester. Over one of these lots a small brook ran on its way to Girty's run.

It was carried over a mill-race on the other side of the street, in a trough or bridge, to the road-way, across which it was conducted in a sluice, from which it fell upon one of the lots sold Pfiester, and found its way across the field to the run. Pfiester appears to have been among the first of the purchasers from Klopfer to build upon his lots. He filled and graded the lots along their entire front, and then covered them with a row of seven houses, built in 1873. The street was raised, presumably under the directions of the proper officers, to a grade corresponding with that of the lots, the trough over the race was removed, and whatever water was flowing along the bed of the brook fell into the race, and followed its course to the mill and Girty's run. Without the trough it could not reach the street. In the street, and on the lots of Pfiester, the filling and grading had covered up its former channel, so that the water could not flow in it if the trough over the race had remained. On the other side of the street the lots were owned by Seibert. He graded and filled in the upper side of the street to correspond with the work on the lower side, and built over his entire front. This filled the bed of the stream for a considerable distance above the street, turned it into Gray's alley, and forced it to find its way to the race at another point by the way of the alley.

Now, it must be borne in mind that the lots owned by the plaintiffs below do not lie upon or along this alleged water-course. They are upon the upper side of Evergreen street, but at some distance to one side. The water is not thrown back upon them by the grading on Pfiester's lots, or by the filling of the street, or by the grading and filling on Seibert's lots; but, passing around Seibert's improvements, the brook finds its way into Gray's alley, follows that to the race, and then follows the race in its effort to reach Girty's run, until, passing the houses of the plaintiffs, it finds its way by percolation from the race into their cellars. It will thus be seen that no question affecting the rights of riparian owners is presented, for the plaintiffs had no ownership upon or interest in the water-course. The lots of the plaintiffs are in no sense a dominant tenement, having an easement on or over the property of the defendant. They very clearly had no such easement. The rule is well stated in Angell on Water-Courses, 6th ed. § 108 *o*, as follows:

" It is only when the flow of water on one person's land is identified with that on his neighbor's, by being traceable to it along a distinct and defined course, that the two proprietors can have natural relations with each other in respect of it, considered as the subject of separate existence." This case does not involve an interference with such a " distinct and defined course " of a stream, as to raise any question about the right of an upper owner to have the water pass from his lands, or of a lower owner to insist that it shall come to him along its usual bed, but owners of lots in the neighborhood complain that water has been thrown upon them by the wrongful act of Pfiester. Whether the water shall follow its original bed is not for them to say, for they have no interest in the original bed, and no rights over it as riparian owners. They have a right to insist that it shall not be thrown upon them, and to treat the act of him or them by whom it it so thrown as a trespass.

But their action is against Jones, and we are to inquire into his relation to the trespass. The trespass was committed by Pfiester in 1873. Jones acquired his title to the two houses owned by him nine years after they were built, and nine years after the filling was done. The houses of the plaintiffs were also on the ground at that time, and some of them had been occupied for six years. These actions were brought in 1888, six years after Jones acquired title, and fifteen years after the grading and filling by Pfiester which is now the subject of complaint. How, then, is Jones liable? It is admitted that he has done no act that is complained of. He merely became the owner of the houses nine years after they were built, and has continued to own and use them. But it is said that his grantor obstructed a natural water-course in the construction of these houses, and that Jones has been notified of that fact, and has thus become liable to respond in damages for continuing the obstruction. Whatever might be the effect of such a notice from the owner of a superior or inferior tenement having rights in the water-course, the notice relied on comes from those who have no more right to give it than any other citizen of Shaler township. Their lots do not touch nor are they in any manner affected by the water-course. They lie along the old race, and the complaint of the owners is that the water of the stream finds its way into the race, along the race to the front of their

houses, and through the soil into their cellars. Some of their houses were built in 1876, some in 1878, and the rest in 1882, —all of them six and some of them twelve years before this suit was brought. The obstruction on Pfiester's lots and in the street was there, and the water was running in the race for three years before any of their houses were built, so that they had the fullest knowledge of the situation before they began to build. Upon these facts we hold the law to be:

1. That the plaintiffs, having no interest in the water-course, have no right to invoke the rules of law intended for the protection of those who have an easement, as riparian owners, in the flow of the water over the lands of others.

2. That the notice to Jones that his predecessor in title had obstructed the flow of the water along a natural bed did not affect him, because it did not come from one having any ownership in or along the bed or water-course which was the subject of the notice.

3. Upon the facts before us, Jones is not liable for the trespass of his vendor. The damages, whether direct or consequential, that flow from the act of Pfiester, to those not interested in the water-course, are like the damages resulting from any other trespass, and are properly chargeable to him by whom the trespass was committed.

4. In the absence of proof to the contrary, it is to be presumed that the change in grade of the street in front of Pfiester's lots was made under the direction of the public authorities. Especially ought this to be presumed after 15 years of acquiescence and use of the highway as graded. For the reasons now given,

The judgment is reversed.